**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| WANDA ALLEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:11-CV-0108 (WLS) |
| | : | |
| ARCHIBOLD MEDICAL CENTER, INC. | : | |
| *doing business as* PELHAM PARKWAY | : | |
| NURSING HOME, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### ORDER

Presently pending before the Court is Defendant Archbold Medical Center, Inc.'s Motion for Summary Judgment (Doc. 28).  For the following reasons, Defendant Archbold Medical Center, Inc.'s Motion for Summary Judgment (Doc. 28) is **GRANTED**.

## I.  PROCEDURAL HISTORY

Plaintiff Wanda Allen, an African-American female, worked for Pelham Parkway Nursing Home in Pelham/Archbold Medical Center, Inc. from 1995 to May 6, 2011, when she was terminated.  (Doc. 1 ¶¶ 3, 5.)  On August 18, 2011, by and through counsel, Plaintiff filed a Complaint in the above-captioned matter, asserting claims for race discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. § 2000e *et seq.*, and intentional infliction of emotional distress in violation of Georgia law.  (Doc. 1.)  On October 4, 2012, Plaintiff, no longer represented by counsel (*see* Doc. 19), moved to amend her Complaint to include additional facts in support of the allegations in her Complaint.  (Doc. 25.)  The Court granted Plaintiff's Motion to Amend by order dated November 6, 2012.  (Doc. 27.)

1

On November 19, 2012, Defendant moved for summary judgment as to Plaintiff's Complaint. (Doc. 28.)  In support of summary judgment, Defendant contends: 1) Plaintiff's claims regarding matters that occurred prior to April 16, 2010, are barred for failure to timely file a charge with the Equal Employment Opportunity Commission ("EEOC"); 2) Plaintiff's timely claims do not establish a prima facie case of race discrimination, retaliation, or intentional infliction of emotional distress; and 3) to the extent Plaintiff is seeking relief for tortious interference with contract, Defendant cannot be found to interfere with its employment relationship with its own employee. (Doc. 28-1.)

On November 21, 2012, in accordance with the Court's procedures governing notice to *pro se* plaintiffs, the Court issued an order directing Plaintiff to file a response in opposition to Defendant's motion. (Doc. 33.)  Plaintiff was noticed that she would be required to respond in opposition to Defendant's motion "with affirmative affidavits, depositions, documents[, and] rely with specificity upon evidence that is part of the record." (*Id.* at 1-2.)  Plaintiff was further noticed that "[i]f a party fails or refuses to file any materials in opposition to a motion for summary judgment, a **FINAL** judgment may be rendered against that party if otherwise appropriate under the law. In that event, *there would be no trial or any further proceedings.*" (*Id.* at 2.)

Despite the aforementioned admonition, on December 12, 2012, Plaintiff filed only a Responsive Statement of Material Facts (Doc. 35) and her own Statement of Material Facts (Doc. 36).  Plaintiff did include exhibits with her responsive statement of facts. (Doc. 36-1.)  Plaintiff did not, however, file a brief in opposition to Defendant's Motion for Summary Judgment. (*See generally* Docket.)  Nevertheless, on December 21, 2012, Defendant filed its Reply in Support of its Motion for Summary Judgment.

(Doc. 37.)   The briefing period closed on December 21, 2012, and, therefore, it was intended that the parties would be permitted no further pleadings on Defendant's Motion for Summary Judgment.   On April 2, 2013, however, almost four months after the briefing period closed, Plaintiff filed a document entitled "Plaintiff's Brief."   (Doc. 38.)

On April 15, 2013, Defendant moved to strike Plaintiff's Brief as an unauthorized, untimely sur-reply.   (Doc. 39.)   Plaintiff responded on April 22, 2013, stating that her brief was not intended to be a sur-reply; rather, Plaintiff states that her brief was inadvertently omitted from her December 12, 2012 filing.   (Doc. 40.)   To that end, Plaintiff requested that the Court accept her "Brief" and allow Defendant the opportunity to reply.   (*Id.*)   On April 25, 2013, Defendant replied, contending that it would be prejudiced if it were required to incur the expense of filing another reply in addition to the one previously filed on December 21, 2012.   (Doc. 41.)   Because the Court concludes that Defendant is entitled to judgment as a matter of law, the Court finds that further reply from Defendant is not needed, nor is it necessary to strike Plaintiff's untimely filing.

## II.   **Summary Judgment Standard**

### A.   **Federal Rule of Civil Procedure 56**

Pursuant to Fed. R. Civ. P. 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   An issue is "genuine" if the quantum and quality of proof necessary to support liability under the claim is raised.   *Allen v. Tyson Foods*, 121 F.3d

642, 646 (11th Cir. 1997).  A fact is "material" if it hinges on the substantive law at issue and it might affect the outcome of the nonmoving party's claim.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *see also Allen*, 121 F.3d at 646.  A judgment is appropriate "as a matter of law" when the nonmoving party has failed to meet its burden of persuading the Court on an essential element of the claim.  *See Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 804 (1999); *Celotex*, 477 U.S. at 323.

The movant bears the initial burden of showing that there is no genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by showing or pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See id.* at 322-24.  Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.  To avoid summary judgment, the nonmoving party must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts." *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict.  *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.  However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c).

**B.**    **Local Rule 56**

Local Rule 56 requires the following from a respondent to a motion for summary judgment:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56.  Here, Defendant properly filed a summary judgment motion along with a statement of undisputed facts, as is required by the Federal Rules of Civil Procedure and the Local Rules of this Court.  (*See* Docs. 28, 29.)  Plaintiff filed both a Responsive Statement of Material Facts and her own Statement of Material Facts to which she believes there is a genuine issue of disputed fact.  (Docs. 35, 36.)  While Plaintiff's own Statement of Material Facts (Doc. 36) did include specific citations to record evidence, Plaintiff's Responsive Statement of Material Facts (Doc. 35) did not. Specifically, a review of Plaintiff's Responsive Statement of Material Facts demonstrates that although Plaintiff sought to controvert Defendant's recitation of the facts, or supplement these facts, Plaintiff failed to accompany her factual assertions with any citations to the record.  Thus, in accordance with L.R. 56, the facts set forth in Defendant's Statement of Material Facts are deemed admitted.  That these facts are deemed admitted by operation of the local rules does not, however, mean that Defendant will be excused from "the initial burden of production in demonstrating the absence of any genuine issue of material fact," or that the Court is relieved of its duty to "satisfy itself that the burden has been satisfactorily discharged." *Reese v. Herbert*, 527

F.3d 1253, 1268 (11th Cir. 2008). Having established the applicable summary judgment standards, the Court will proceed to the facts.

## III.   **RELEVANT FACTUAL BACKGROUND**

The following facts are derived from the Complaint (Docs. 1, 25); Defendant's Answer (Doc. 4); Defendant's Statement of Undisputed Facts (Doc. 29); and Plaintiff's Statement of Disputed Material Facts (Doc. 36) and Defendant's Response to Plaintiff's Statement of Disputed Facts[1] (Doc. 37), all of which were submitted pursuant to Local Rule 56; and the record in this case.  Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in a light most favorable to Plaintiff as the nonmoving party.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); Fed. R. Civ. P. 56.

Defendant Archbold Medical Center, Inc. operates hospitals and nursing homes in various locations in South Georgia, including Pelham Parkway Nursing Home ("PPNH"), Mitchell County Hospital ("MCH"), and John D. Archbold Memorial Hospital ("JDAMH").  (Doc. 29 ¶ 2.)   Plaintiff was hired by Archbold on or about September 12, 1995, and began her employment as a Certified Nursing Assistant at PPNH.  (*Id.* ¶ 2.)   Plaintiff became a Registered Nurse (R.N.) in 1998, and she transferred to MCH on or about December 14, 1998.  (*Id.* ¶ 3.)  Plaintiff worked as a R.N. at MCH from December 14, 1998, until September 16, 2002, when she became a Nurse Manager at that facility.  (*Id.*)  Plaintiff resigned from her position as MCH on or about May 5, 2004.  (*Id.*)

---

[1] Defendant's response to Plaintiff's Statement of Facts was contained in its Reply in Support of its Motion for Summary Judgment.  (Doc. 37 at 2-3.)

Plaintiff reapplied to Archbold in May 2006, and she was hired as a Staff R.N. at JDAMH on May 30, 2006.  (*Id.* ¶ 4.)  In August 2006, Plaintiff applied for a transfer to be Director of Nursing at PPNH.  (*Id.*)  Plaintiff began serving in this position on November 26, 2006.  (*Id.*)  When Plaintiff was transferred to the Director of Nursing position at PPNH, she came under the supervision of Jackie Ragan, the Administrator of PPNH.  (*Id.* ¶ 8.) When Ms. Ragan left PPNH in September 2010, Shelly Kirkendoll became the interim Administrator until February 2011, when James Womack was hired as the Administrator.  (*Id.*)

On March 4, 2010, Plaintiff issued a Final Corrective ("FC") to Michelle Sharp, a white employee, for responding to Plaintiff, her supervisor, "in a disrespectful/loud tone of voice" and standing over Plaintiff during the exchange.  (Doc. 36-1 at 4.)  After Ms. Sharp filed a grievance, Defendant changed it to a Written Corrective ("WC").  (*Id.* at 7.) Plaintiff disagreed with the downgrading of Ms. Sharp's corrective.  (*Id.*)

In July 2010, PPNH was surveyed by the Georgia Department of Community Health and received a finding of "immediate jeopardy" at the nursing home.  (Doc. 29 ¶ 15.)  Defendant states that such a finding is the "most serious finding that a nursing home can receive on the Department's inspection scale."  (*Id.*)  Four members of the management team at PPNH received discipline because of the "immediate jeopardy" finding: Linda Ethel (white), the Assistant Director of Nursing, received an indefinite suspension and was subsequently terminated after further review; Ms. Sharp, the Clinical Coordinator, received a two-day suspension; Plaintiff received a three-day suspension; and Ms. Ragan (white) received a Corrective Interview.  (*Id.* ¶ 16.) Plaintiff's Notice of Suspension stated that she was being suspended "[d]ue to failure to insure staff education was conducted and Policy and Procedures were implemented for

an issue that had the potential to affect [PPNH's] residents and [its] regulatory compliance." (Doc. 29 ¶ 18.)  Plaintiff's Notice further advised Plaintiff that "Upon your return to duty, unless positive action is taken on your part to correct the above, you are liable to further disciplinary action, which may include discharge." (*Id.* ¶ 19.)

Plaintiff acknowledged that, on the State survey, there was a finding of a "significant deficiency of an immediate jeopardy" related to the proper cleaning of glucometers. (*Id.* ¶ 20.)  Plaintiff told Beverly Hurst, Personnel Coordinator at PPNH, that she (Plaintiff) took responsibility for the "immediate jeopardy" finding. (*Id.* ¶ 21.) Plaintiff returned to work on July 27, 2010. (*Id.* ¶ 24.)  When Plaintiff returned from her suspension, she received a FC on July 28, due to her failure to inform her staff, educate her staff, and implement performance monitors regarding infection control. (*Id.* ¶ 25.)  The FC cited a violation of Employee Handbook Rules & Regulation #25, page 46 – Poor & Careless Work Performance. (*Id.* ¶ 26.)  During the FC Interview, Ms. Ragan asked Ms. Hurst to step into Plaintiff's office. (*Id.* ¶ 30.)  Plaintiff and Ms. Ragan were having a discussion when Ms. Ragan placed her hands on Plaintiff's desk. (*Id.*) Plaintiff advised Ms. Ragan that she did not want Ms. Ragan "in her space." (*Id.*)  Ms. Ragan moved completely away from Plaintiff's desk and stated that she was only placing her hands on the desk and was in no way trying to invade Plaintiff's space. (*Id.*)  Per Plaintiff's account, Ms. Ragan "did not have to lean over Plaintiff's desk pointing her finger at Plaintiff [sic] face to talk to Plaintiff." (Doc. 35 ¶ 30.)

Plaintiff went out on Family and Medical Leave Act ("FMLA") leave on July 28, 2010, and was out until September 7, 2010. (*Id.* ¶ 31.)  On August 3, 2010, Plaintiff filed a Grievance regarding the July 28, 2010 FC. (*Id.* ¶ 32.)  When Plaintiff returned from her FMLA leave on September 7, 2010, she received another FC, based on what

Defendant describes as Plaintiff's "unprofessional and insubordinate response to the July 28, 2010, discipline and on Plaintiff's having disregarded instructions given to her by Ms. Ragan and Shelly Kirkendoll, Archbold's Director of Long Term Care." (*Id.* ¶ 34.)

A Patient Fall and Restraint Risk assessment was completed at PPNH on March 23, 2011 ("March 23 risk assessment"), by Ms. Kirkendoll and Abby Windham, Archbold's Risk Manager. (*Id.* ¶ 44.) Mss. Kirkendoll and Windham checked issues that would affect patient safety, Centers for Medicare and Medicaid Services (CMS) compliance, and Joint Commission Accreditation. (*Id.*) Through the day, Mss. Kirkendoll and Windham conversed with multiple members of the nursing staff, including Plaintiff. (*Id.*) As part of risk assessment, Plaintiff received an audit. (*Id.*) On April 26, 2011, Mss. Kirkendoll and Windham returned to PPNH to review the progress with the suggested corrective actions from the March 23 risk assessment. (*Id.* ¶ 47.) During the March 23, 2011 visit, they had identified 33 issues that affected patient safety, CMS compliance, and Joint Commission Accreditation. (*Id.*) On April 26, 2011, they checked 22 of the 33 issues. (*Id.*) Of those 22, 12 items were found to have been corrected but 10 had not been corrected. (*Id.*) Ms. Kirkendoll concluded that Plaintiff failed to follow up on those issues even though Plaintiff had been made fully aware of their potential effect to the safety of the residents and regulatory compliance. (*Id.*)

Also on April 26, 2011, Plaintiff was confronted by Archbold's Chief Operating Officer, Kevin Taylor, about two incidents that had occurred the previous weekend: an alleged rape and a choking death. (*Id.* ¶ 49.) Plaintiff was asked to explain what happened regarding the rape. (*Id.*) Plaintiff told Mr. Taylor that the nurse called the RN on call, who did not answer. (*Id.*) The nurse then called Plaintiff, who did not

answer.  (*Id.*)  The nurse did not leave a message for either call.  (*Id.*)  The nurse then contacted the police department to report the incident.  (*Id.*)  When Mr. Taylor asked Plaintiff if she thought it was appropriate that she did not become aware of the incidents until Monday, Plaintiff responded in loud and rude tones, per other attendees to the meeting.  (*Id.* ¶ 50.)  Plaintiff also responded that she thought the notification of an RN was adequate when queried as to whether administrators should be made aware of such incidents.  (*Id.*)  Notably, Plaintiff does not deny the description of how the exchange took place.  (Doc. 35 ¶ 50.)

On April 27, 2011, Plaintiff received an Absenteeism Warning for being absent on three occasions: April 20, 21, and 22, 2011.  (Doc. 29 ¶ 51.)  Plaintiff does not deny the circumstances surrounding this verbal warning.  (Doc. 35 ¶ 51.)

On April 27, 2011 and May 2, 2011, respectively, Mr. Wheeler, then Administrator of PPNH, received emails from Ms. Kirkendoll about the exchange between Plaintiff and Mr. Taylor over the rape and choking death and Plaintiff's failure to address, as of April 26, 2011, all of the deficiencies identified by the March 23 risk assessment.  (Doc. 29 ¶¶ 53-54.)  Ms. Kirkendoll "stated that, despite the FCs issued to Plaintiff in July and September 2010, [Plaintiff] continued to be insubordinate and lacked the required leadership skills to do her job effectively."  (*Id.* ¶ 55.)  Ms. Kirkendoll "further stated that Plaintiff continued to delegate tasks and failed to follow up behind her staff to ensure the tasks were completed."  (*Id.*)  Per Ms. Kirkendoll, "since the previous efforts to counsel and guide Plaintiff had been unsuccessful and because her insubordination and lack of follow through was putting the residents at risk, [Ms. Kirkendoll] was recommending that Plaintiff's employment be terminated."  (*Id.*)  On Friday, May 6, 2011, Plaintiff was informed that a decision had been made to make a change in

management.  (*Id.* ¶ 56.)  A separation notice was issued to Plaintiff on May 9, 2011. (*Id.*)

Plaintiff submitted an Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC") on August 9, 2010, after she received the three-day suspension and her July 28, 2010 FC.  (*Id.* ¶ 58; Doc. 29-1 at 98-101.)  In response to the Intake Questionnaire, Plaintiff listed two incidents alleged to be discriminatory: 1) on November 5, 2009, "new standards" were incorporated into her evaluation for which she was not made aware prior to being evaluated on them and 2) on July 28, 2010, a Final Corrective was given to her and she was advised she would be terminated for "any" incident.  (Doc. 29 ¶ 59; Doc. 29-1 at 99.)  On or about October 13, 2010, Plaintiff filed a Charge of Discrimination with the EEOC, alleging race discrimination.  (Doc. 29-1 at 105-106.)  On Plaintiff's EEOC Charge form, she indicated that the "earliest" date that discrimination allegedly took place was July 21, 2010, which was the date her suspension took place.  (*Id.* at 105; Doc. 29 ¶ 61.)  On the Charge Form, Plaintiff indicated that the "latest" date that discrimination took place was July 28, 2010, which was the date she received the first FC.  (Doc. 29-1 ¶ 62; Doc. 29-1 at 105.)  Plaintiff checked the "race" and "retaliation" boxes on the Charge form.  (Doc. 29-1 ¶ 63; Doc. 29-1 at 105.)  On May 19, 2011, the EEOC issued a Notice of Right to Sue.  (Doc. 1-2.)

## IV.  <u>DISCUSSION</u>

In support of summary judgment, Defendant contends that: 1) Plaintiff's claims regarding matters that occurred prior to April 16, 2010, are barred for failure to timely file an EEOC charge; 2) Plaintiff's timely claims for discrimination—a) her July 21, 2010 three-day suspension, b) her July 28, 2010 Final Corrective, and c) her May 9, 2011 Termination—do not establish a prima facie case of race discrimination, retaliation, or

intentional infliction of emotional distress; and 3) to the extent Plaintiff is seeking relief for tortious interference with contract, Defendant cannot be found to interfere with its employment relationship with its own employee.  (Doc. 28-1.)  The Court will address each of these arguments in turn.

### A.      Timeliness of Plaintiff's EEOC Charge

A plaintiff may not sue under Title VII unless she first exhausts administrative remedies by filing a timely charge of discrimination with the EEOC.  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir.2001) (Title VII).   In a nondeferral state such as Georgia, a charge of discrimination is timely if it is filed within 180 days after the alleged act of discrimination. *See Sheffield v. UPS, Inc.*, 403 F. App'x 452, 455 n.2 (11th Cir. 2010).  "A charge of discrimination is considered filed upon receipt, 29 C.F.R. § 1601.13(a), and the 180–day clock begins to run when the employee receives notice of the adverse employment action."  *Kelly v. Dun & Bradstreet Corp.*, 457 F. App'x 804, 805 (11th Cir. 2011) (citations omitted).  While an intake questionnaire may constitute a charge for the purpose of meeting the 180-day deadline, the questionnaire must be "verified," contain "basic information," and be accompanied by circumstances that "would convince a reasonable person that the charging party manifested her intent to activate the administrative process by filing the intake questionnaire with the EEOC." *Wilkerson*, 270 F.3d at 1321. Regardless of whether the Plaintiff is proceeding on an actual charge or a verified questionnaire, "[f]ailure to file a timely charge with the EEOC results in a bar of the claims contained in the untimely charge." *Rizo v. Ala. Dept. of Human Resources*, 228 F. App'x 832, 835 (11th Cir. 2007) (citations omitted).

Plaintiff's Charge of Discrimination, which was filed on October 13, 2010, cited the following as alleged discriminatory acts: 1) the November 5, 2009 evaluation that

Plaintiff alleges used standards she "was not made aware of;" 2) the July 21, 2010 three-day suspension; and 3) the July 28, 2010 Final Corrective.  (Doc. 29-1.)  For the claim regarding the November 5, 2009 evaluation to be timely, Plaintiff had to file her charge by May 4, 2010.  Neither of Plaintiff's submissions to the EEOC, her October 13, 2010 Charge or her August 9, 2010 unsigned Intake Questionnaire, even if considered[2], meet this deadline.  As such, Plaintiff's claims as to the November 5, 2009 evaluation are barred for Plaintiff's failure to include them in a timely filed charge.  Accordingly, the Court will proceed with its analysis of Plaintiff's claims regarding her July 21, 2010 three-day suspension and July 28, 2010 Final Corrective, the only two discriminatory acts in Plaintiff's Charge that occurred within the 180-day window, as well as Plaintiff's discrimination and retaliation claims related to her May 9, 2011 Termination.

### B.   Substantive Merits of Plaintiff's Claims

#### 1.   Race-Based Discrimination

When a plaintiff seeks to prove a Title VII violation through circumstantial evidence (as is the case here since Plaintiff offers no direct evidence of discrimination), the Court is guided by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).  Under this framework, in order to establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that s/he: 1) is a member of a protected class; 2) was qualified for the position; 3) suffered an adverse employment

---

[2] To be clear, the Court does not find that Plaintiff's unsigned Intake Questionnaire constitutes a charge. It was unsigned, and as noted in *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1321 (11th Cir. 2001), to constitute a charge, the Questionnaire must be verified.  "A charge is verified when it is 'sworn to or affirmed before a notary public, designated representative of the Commission, or other person duly authorized by law to administer oaths and take acknowledgments, or supported by an unsworn declaration in writing under penalty of perjury.' 29 C.F.R. § 1601.3(a). Verification is mandatory." *Forster v. A & M Hospitalities, LLC*, No. 7:10-cv-112, 2012 WL 1252527, at *5 (M.D. Ga. Apr. 13, 2012) (citing *Vason v. City of Montgomery, Ala.*, 240 F.3d 905, 907 (11th Cir.2001)).  Plaintiff's Questionnaire is neither signed nor notarized.

action; and 4) can show that similarly situated employees outside of his/her protected class were treated more favorably or was replaced by someone outside of her his/her protected class. *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842 (11th Cir. 2000). If the claimant establishes a *prima facie* case of discrimination, this creates a presumption of discrimination, and the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action to rebut the presumption. *Standard*, 161 F.3d at 1331.

### a)   Final Corrective

Plaintiff received two FCs during the course of her employment. On July 28, 2010, the day Plaintiff returned to work from her three-day suspension for the "immediate jeopardy" finding, Plaintiff was given a FC "due to her failure to inform her staff, educate her staff, and implement performance monitors regarding infection control. (Doc. 29 ¶ 25.) On September 7, 2010, when she returned from her FMLA leave, Plaintiff received another FC, "based on her unprofessional and insubordinate response to the July 28, 2010, discipline and on Plaintiff's having disregarded instructions given to her by Ms. Ragan and Shelly Kirkendoll, Archbold's Director of Long Term Care." (*Id.* ¶ 34.) Defendant contends the FCs did not constitute adverse employment action for the purpose of establishing a *prima facie* claim of discrimination. (Doc. 28-1 at 8-9.)

"Not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). "To prove an adverse employment action . . . an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* at 1239 (emphasis in original). Importantly, the "employee's subjective view of the

significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

Because Defendant states that it relied on the FC in its decision to terminate Plaintiff, the Court concludes that the FC can still constitute adverse employment action.  In *Davis*, the Court did not limit tangible consequences to loss of pay or benefits; the Eleventh Circuit suggested that a tangible consequence can also be "further discipline."  245 F.3d at 1240.  Post-*Davis*, courts have considered a reprimand later relied upon as grounds for termination to be "adverse employment action," *see, e.g., Hooper v. Total Sys. Servs., Inc.*, 799 F. Supp. 2d 1350, 1377 (M.D. Ga. 2011), especially where the reprimand specifically stated that the "future actions would result in further, and possibly more serious disciplinary action, *Wallace v. Georgia Dept. of Transp.*, No. 7:04-cv-78, 2005 WL 2031111, at *11 (M.D. Ga. Aug. 23, 2005)[3].  Here, Defendant stated in its Brief in Support of Summary Judgment that Plaintiff's termination was due to, in part, the corrective actions received during the course of Plaintiff's employment.  (Doc. 28-1 at 2.)  Additionally, both FCs contained language indicating that future actions would trigger more serious discipline.  (*See* Doc. 29-1 at 89 ("Employee is advised that any further incident *will* result in termination."); Doc. 29-1 at 92 ("Employee is advised that any further display of unprofessional behavior or disrespectful behavior toward supervisor will not be tolerated and will be subject to further disciplinary actions to

---

[3] Although the "adverse employment action" standard differs in the retaliation context, the *Wallace* Court specifically relied on *Davis*, a discriminatory discipline case, in reaching its conclusion that a formal reprimand that leads to the "possibility of more formal discipline" can possibly "fall . . . within the ambit of an adverse employment action."  *Wallace v. Georgia Dept. of Transp.*, No. 7:04-cv-78, 2005 WL 2031111, at *11 (M.D. Ga. Aug. 23, 2005) (citing *Davis v. Town of Lake, Park, Fla.*, 245 F.3d 1232, 1240-41 (11th Cir. 2001)).

include possible termination.")) As such, the Court finds that the FCs issued by Defendant to Plaintiff constitute adverse employment action.

Despite the Court's conclusion that the FCs are adverse employment action, the Court nonetheless concludes that Plaintiff has failed to establish a *prima facie* claim of discrimination for either the July 28, 2010 or September 7, 2010 FCs due to her failure to identify a similarly situated comparator. In order to determine whether a valid comparator has been presented, the Court must consider "whether the comparators were involved in, or accused of, the same or similar conduct and disciplined differently." *Beckles v. Federal Exp. Corp.*, No. 11-14283, 2012 WL 3932112, at *2 (11th Cir. Sept. 11, 2012) (citing *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)). A plaintiff is similarly situated to another employee only if the "quantity and quality of the comparator's misconduct" are "nearly identical." *Johnson v. Miller Brewing Co.*, 341 F. App'x 477, 478 (11th Cir. 2009) (quoting *Burke-Fowler*, 171 F.3d at 1323). Importantly, "[t]he plaintiff and the employee she identifies as a comparator must be similarly situated "in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (citations omitted). This requirement that the comparator be "nearly identical to the Plaintiff" is in place "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (citations omitted).

Plaintiff does not dispute the reasons underlying the FC; rather, she asserts that the severity of the disciplinary action was imposed discriminately. (Doc. 36 ¶ 12.) Per Plaintiff, when she issued a FC to a subordinate, Ms. Sharp, a white employee, Ms. Sharp's disciplinary action was mitigated down from a FC to a WC after Ms. Sharp filed a grievance. (*Id.*) Because Plaintiff's grievances did not similarly result in any

16

downward mitigation, Plaintiff contends that this is evidence that Defendant's disciplinary procedures are discriminatory.

Fatal to Plaintiff's claim, however, is her failure to demonstrate parity between her and Ms. Sharp's conduct. Specifically, the quality and character of Plaintiff's and Ms. Sharp's misconduct differ quite markedly. Plaintiff was issued a FC on July 28, 2010 for, *inter alia*, failing to keep her entire staff informed of issues with a tendency to affect the residents of PPNH and PPNH's regulatory compliance. (Doc. 29-1 at 89.) Her September 7, 2010 FC was issued because of insubordination. (*Id.* at 92.) According to the FC sheet, Plaintiff became confrontational after her superiors inquired into why she disregarded directions about training on glucometer cleaning and disinfecting. (*Id.*)

Ms. Sharp was issued a FC by Plaintiff on March 4, 2010, for insubordination but that is where the similarities stop. Plaintiff's insubordination reprimand was issued for Plaintiff's inappropriate response to concerns about her failure to train her employees, in accordance with directives, on concerns affecting the *safety* of PPNH residents. Also of note, Plaintiff's FC for insubordination concerned procedural-related issues and came on the heels of a state survey designating PPNH in "immediate jeopardy," a finding that designates a nursing home as being noncompliant with certain federal regulations. On the other hand, Ms. Sharp's insubordination, while not condoned by this Court, appears to have arisen out of a simple disagreement between Ms. Sharp and her superior, Plaintiff. Thus, while both incidents involve insubordination to a superior, they differ in quality and importance of the matters implicated when the insubordination took place— a fact the Court finds to be critically important (and outcome determinative in this instance) to Plaintiff's comparator claim. *Rioux v. City of Atlanta, GA*, 520 F.3d 1269, 1281 (11th Cir. 2008) ("[T]he most important factors in a comparator analysis in the

disciplinary context are the nature of the offenses committed and the nature of the punishments imposed.")   Accordingly, in the absence of any other evidence of discrimination, Defendant is entitled to judgment as a matter of law as to Plaintiff's discrimination claims related to her July 28, 2010 and September 7, 2010 FCs. *Wilson*, 376 F.3d at 1092 ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.")

### b)   Suspension and Termination

Plaintiff's *prima facie* claims as to her July 21, 2010 suspension and May 6, 2011 termination also fail because Plaintiff failed to identify a similarly situated comparator. As noted above, at this stage of the analysis, the Court assesses whether other employees engaged in conduct similar to Plaintiff's but were disciplined in different ways such that the employer engaged in discriminatory discipline. *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia*, 171 F.3d at 1368).

### i.   July 21, 2010 Suspension

The Defendant contends that Plaintiff was suspended in July 2010 because of the "immediate jeopardy" finding.  (Doc. 28-1 at 11.)  Plaintiff states that she found this disciplinary action "not appropriate, fair, nor consistent" in comparison to the discipline administered to the white employees in response to the "immediate jeopardy" finding. (Doc. 35 ¶ 23.)  In support of this argument, Plaintiff proffers Ms. Sharp and Ms. Ragan as similarly situated comparators, and argues that these women received less severe discipline for the jeopardy finding.

In response to the "immediate jeopardy" finding, Ms. Sharp received a two-day suspension and Ms. Ragan, a corrective interview.  Defendant states that Plaintiff's

discipline was harsher than Ms. Sharp's and Ms. Ragan's because the problems caused by the jeopardy finding were in the area of infection control, which was the responsibility of the nursing staff. (Doc. 28-1 at 11.) Per Defendant, as Director of Nursing, the area of infection control was "Plaintiff's responsibility." (*Id.*) Defendant also notes that Plaintiff admitted to taking responsibility for the "immediate jeopardy" finding. (Doc. 28-1 at 11; Doc. 29-1 at 5.)

Plaintiff has provided no response to Defendant's assertion that Plaintiff was disciplined more harshly because infection control was her responsibility as the Director of Nursing. (*See* Docs. 35, 36, 38.) Plaintiff has merely argued that the discipline given to her should have been consistent with that given to the Clinical Coordinator (Ms. Sharp) and the Administrator of PPNH (Ms. Ragan). Such an argument, however, disregards the fact that Plaintiff has offered no evidence to demonstrate that Ms. Sharp and Ms. Ragan bore the same level of culpability for the problems identified by the state survey as she did as the Director of Nursing. Thus, although Plaintiff identified individuals disciplined for the same general misconduct, Plaintiff failed to provide evidence to show that the "quantity and quality" of each employee's misconduct was identical with regard to level of culpability. As such, Plaintiff has failed to identify a similarly situated comparator for her July 21, 2010 suspension.

### ii.      May 6, 2011 Termination

The Court also finds that Plaintiff has failed to identify a similarly situated comparator for her May 6, 2011 termination. According to Defendant, Plaintiff's termination followed two FCs, a number of concerns by management about Plaintiff's performance and attitude, two serious incidents (a reported rape and a patient choking to death) that occurred in the nursing home on the same weekend, and Plaintiff's failure

to follow through on recommendations from a risk management done in March 2011. Plaintiff argues that Leslie Ponder, RN, the Assistant Director of Nursing, is a similarly situated comparator because Ms. Ponder "was also equally responsible for safety recommendations during March 2011 as well as the weekend incidents that transpired April 2011." (Doc. 38 at 6-7.) The Court finds this argument to be insufficient to identify Ms. Ponder as an individual similarly situated "in all relevant aspects" to Plaintiff.

First, Plaintiff has failed to present any evidence to support her statement that Ms. Ponder was "equally responsible" for the safety recommendations given during March 2011 and the events that occurred the weekend of April 2011. Importantly, Plaintiff was the *Director* of Nursing, whereas Ms. Ponder was Plaintiff's *Assistant* Director of Nursing. In fact, Plaintiff was considered one of the four "leaders" of PPNH, along with the Administrator, Chief Operating Officer, and Director of Long-Term Care. (Doc. 29 ¶ 50.) Although job titles are not dispositive to the Court's inquiry in a disparate-treatment claim, "'material differences' in 'ranks and responsibilities' may render any comparison impossible without 'confusing apples with oranges." *Lane v. McKeithen*, 423 F. App'x 903, 906 (11th Cir. 2011) (citations omitted). The Court cannot disregard the responsibilities and duties held by Plaintiff as the Director of Nursing in assessing whether Plaintiff can establish that she is similarly situated to Ms. Ponder. Winston Churchill once said, "The price of greatness is responsibility." The undisputed record demonstrates that Plaintiff was Ms. Ponder's superior and that Plaintiff had the ability to discipline Ms. Ponder. (Doc. 35 ¶ 50.) To this end, Plaintiff's proffer of her Assistant Director as a similarly situated comparator to certain events that precipitated Plaintiff's termination, absent any evidence to show that the Assistant v. Acting Director

job titles were nothing more than ceremonial, does not satisfy Plaintiff's burden under *prima facie* case.

Even if the Court accepted Plaintiff's argument that Ms. Ponder was "equally responsible" for the March 2011 safety recommendations and April 2011 weekend events, Plaintiff's termination was not limited to these two triggering events. Plaintiff was also terminated for receiving two FCs and prompting performance and attitude concerns in management. Plaintiff has not presented any evidence to show that Ms. Ponder's employment record mirrored her own in this respect.

Accordingly, because Plaintiff has failed to meet her burden of identifying a similarly situated comparator to any of the adverse employment actions imposed upon her, Plaintiff has failed to establish a *prima facie* case of race-based discrimination, and Defendant is entitled to judgment as a matter of law as to Plaintiff's discrimination claim.

### 2.   Retaliation

Defendant also argues that it is entitled to judgment as a matter of law as to Plaintiff's Title VII retaliation claim. To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: 1) she engaged in statutorily protected activity; 2) suffered an adverse employment action; and 3) the adverse action was causally related to plaintiff's protected activities. *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). Defendant does not dispute that Plaintiff suffered an adverse employment action when she was terminated or that she engaged in statutorily protected expression when she filed a Charge of Discrimination with the EEOC. Rather Defendant contends only that Plaintiff has failed to demonstrate a causal relationship between the filing of her EEOC charge and her termination.

In order to satisfy the causal-link element, "a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citations omitted).  "A plaintiff satisfies this element if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse . . . action."  *Id.* (internal quotations and citations omitted).  "A 'close temporal proximity' between the protected expression and an adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case."  *Id.* (citation omitted).   The Supreme Court has made clear that for "mere temporal proximity" to be sufficient it "must be 'very close.'"  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted).   In *Higdon*, 393 F.3d at 1220, the Eleventh Circuit further held that "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law."  In *Simpson v. State of Ala. Dept. of Human Resources*, 501 F. App'x 951, 954 (11th Cir. 2012), the Eleventh Circuit summed up *Higdon* as concluding that "a lapse in time beyond three or four months, in the absence of other evidence tending to show causation, is insufficient to show close temporal proximity."

In the instant case, Plaintiff's Intake Questionnaire was received by the EEOC on August 9, 2010, and her Charge was received on October 13, 2010.  Plaintiff was not terminated until May 6, 2011.  Per Defendant, the nine-month delay between the filing of Plaintiff's Intake Questionnaire and her termination satisfies the "substantial delay" test of *Higdon*.  In support of her retaliation claim, Plaintiff attempts to avoid the consequences of this delay by arguing that Defendant "attempted to find Plaintiff at

fault for any possible deficiency" during the time period between the filing of her Intake Questionnaire in August 2010 and her termination in May 2011."[4]  (Doc. 38 at 6.)

Contrary to Defendant's assertion, however, "close temporal proximity is not the only means by which a plaintiff can establish a causal connection.  To the contrary, courts have routinely found a causal connection even as to retaliatory acts occurring long after the protected activity, where those events are linked by a chain of intervening retaliatory acts."  *Pears v. Mobile Cnty.*, 645 F. Supp. 2d 1062, 1096 (S.D. Ala. 2009); *Edwards v. National Vision, Inc.*, No. 2:11-cv-01449, 2013 WL 2249051, at *18 (N.D. Ala. May 17, 2013) ("When a significant amount of time has elapsed between the protected activity and the adverse action, a causal connection can exist if and only if the protected activity and the adverse action are linked by a chain of intervening retaliatory acts.") (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998))). Thus, "where the alleged chain of retaliatory treatment commenced immediately after [Plaintiff] complained a court may find the causal connection requirement met for all retaliatory acts in the chain."  *Batts v. Silver Line Bldg. Prods. Corp.*, No. 1:08-cv-3355, 2010 WL 966860, at *13 (N.D. Ga. Feb. 22, 2010) (internal quotations and citation omitted).  "Ultimately, in deciding whether a retaliatory act unsupported by temporal proximity nonetheless meets the *prima facie* causal requirement, a court must 'determine whether there is other evidence raising an inference that the cause of the

---

[4] Neither Defendant nor Plaintiff provides any evidence as to when Defendant was made aware of Plaintiff's filings with the EEOC.  The burden is usually on the Plaintiff to proffer evidence demonstrating that the Defendant was aware of the protected expression at the time s/he took the adverse employment action.  *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1198 (11th Cir. 1997) ("In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action.")  Here, however, Defendant has contended that the August 9, 2010 deadline should be the operative date, implicitly conceding that it was on notice of Plaintiff's protected expression as of August 9, 2010.  Thus, the Court will use August 9, 2010, as the operative deadline for assessing whether there is a causal link.

adverse action was retaliation.'" *Id.* (quoting E.E.O.C. Compliance Manual Vol. 2 § 8-II, E.2).

Here, the record reflects that Plaintiff was terminated, in part, because of three activities postdating the filing of Plaintiff's Intake Questionnaire: 1) Plaintiff failed to address issues identified by the March 23 risk assessment, 2) responded inappropriately and insubordinately to inquiries about a reported rape and choking death that occurred during the same weekend in April 2011, and 3) was issued a verbal absenteeism warning on April 27, 2011.[5]  After reviewing the record, the Court concludes that Plaintiff has presented no evidence to show that these incidents were causally related to her protected activity, such that there is retaliatory chain linking the August 2010 EEOC filing with Plaintiff's May 6, 2011 termination.

The undisputed facts show that the March 23 risk assessment was targeted to all of PPNH, not just specifically directed towards Plaintiff.  (Doc. 29 ¶ 44.)  Defendant contends that Plaintiff's issues arising out of the March 23, 2011 assessment were caused by her failure to follow up, as the Director of Nursing, on all of the action-items identified through the assessment.  (*Id.* ¶¶ 46-48.)  Plaintiff has not denied that it was her responsibility to ensure that the issues identified by the March 23 risk assessment were corrected.  (Doc. 35 ¶ 48.)  Rather, her argument is that Defendant should have either issued correctives for the deficiencies or given Plaintiff "constructive counseling." (*Id.* ¶ 47.)

---

[5] Though technically the September 7, 2010 FC was issued after Plaintiff's August 9, 2010 filing of her Intake Questionnaire, the record demonstrates that the insubordination concerns addressed therein concerned an event that took place before Plaintiff engaged in statutory expression.  Defendant notes that the issuance of this FC was delayed due to Plaintiff being on FMLA leave from July 28, 2010 to September 7, 2010.  (Doc. 29-6 ¶ 9.)  Accordingly, the Court will only address the events and disciplinarian actions that occurred after Plaintiff's EEOC filing.

The Court does not find that an inference of retaliation can be gleaned merely from the fact that Plaintiff was not disciplined in a manner deemed acceptable to her.  It would be inappropriate for this Court to infer retaliatory intent to an appropriate business judgment, where no other evidence of retaliation exists.  *See, .e.g., E.E.O.C. v. McPherson Cos., Inc.*, 914 F. Supp. 2d 1234, 1248 (N.D. Ala. 2012) (concluding that "appropriate exercises of business judgment" that "neither separately nor severally . . . carry any implication of retaliatory motive . . . are not conceivably indicative of retaliatory motive").  Such a requirement runs the risk of creating an inference of retaliatory intent every time an employer decides to terminate an employee for poor performance occurring *after* the employee engages in statutory expression.  Thus, in the absence of any evidence demonstrating that the March 23 risk assessment was imposed as to PPNH with the intent to target Plaintiff for filing an EEOC charge almost eight months before the assessment, Plaintiff has failed to present any evidence showing that the March 23 risk assessment was an intervening retaliatory act.[6]

Plaintiff's arguments are no more tenable with regard to her assertion that the April 2011 weekend events were part of a ploy to find "any possible deficienc[ies]" with Plaintiff.  Again, Plaintiff was one of four leaders for PPNH and the Director of Nursing.  To review the chain of events, Plaintiff was approached by Mr. Taylor, the COO of Archbold, about the rape and choking death that occurred during the weekend of April 2011.  (Doc. 29 ¶ 49.)  Plaintiff does not dispute Defendant's account of Plaintiff's response to Mr. Taylor as being insubordinate and dismissive about the incidents.  (Doc. 35 ¶¶ 49-50.)  Even if the Court considered Defendant's inquiry to Plaintiff about the April 2011 incident to have been motivated by retaliation (no such evidence supports

---

[6] This is especially so in light of the fact that Plaintiff has not alleged that she was prevented from correcting the deficiencies identified by the risk assessment within the month allotted, or otherwise precluded from following through on the issues identified.

such an unsubstantiated conclusion), Plaintiff's insubordination and refusal to take responsibility for the April 2011 occurrences were behaviors under Plaintiff's control, and do not support a finding of retaliatory motive on the part of Defendant. As such, the Court finds that Plaintiff has failed to adduce evidence to show that she was targeted in a retaliatory manner for the April 2011 weekend events, i.e., that the April 2011 weekend events were a retaliatory "link" establishing causation between Plaintiff's EEOC filing and her subsequent termination.

Finally, the Court also finds that Plaintiff has failed to raise an inference of retaliatory intent as to her April 27, 2011 verbal warning for absenteeism. Plaintiff has presented no evidence to show that this verbal warning was unsupported, i.e., that Plaintiff was not absent on April 20, 21, and 22, 2011, as alleged. (*See* Doc. 29 ¶ 51; Doc. 35 ¶ 51.) Plaintiff has therefore failed to establish that the April 27, 2011 verbal warning was anything other than an isolated event, warranted under the circumstances, and not a causal link with a retaliatory taint.

Simply put, Plaintiff incorrectly implies that Defendant must ignore any deficiencies in her employment, even if valid, merely because Plaintiff filed a charge with the EEOC. Such an assertion is unreasonable and would require the Court to interfere with reasonable business judgments. This, the Court cannot, and will not, do. Moreover, even if the Court found that the actions taken towards Plaintiff created a retaliatory link meeting the *prima facie* causal requirement, the deficiencies Plaintiff has not denied—failure to follow through on issues identified by the March 23 risk assessment, insubordination in response to very serious events occurring all in one weekend, and unexcused absenteeism—also serve as legitimate, nondiscriminatory reasons for Plaintiff's termination for which Plaintiff has failed to produce any evidence

of pretext. Accordingly, for all these reasons, Plaintiff's retaliation claim fails as a matter of law.

### C.   <u>State-Law Claims</u>

Having found that Plaintiff has failed to survive summary judgment on his Title VII race-based discrimination and retaliation claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's state-law claims for intentional infliction of emotional distress and tortious interference with contract. *See, e.g., McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1227 (11th Cir. 2002) ("The Court may decline to exercise jurisdiction over state-law claims, where the Court has dismissed all the federal claims over which it has original jurisdiction.") *See also* 28 U.S.C. § 1367(c)(3). Accordingly, these claims are therefore dismissed without prejudice.

### <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 28) is **GRANTED**. It is hereby **ORDERED AND ADJUDGED** that Plaintiff shall take nothing by her Complaint (Docs. 1, 25), and **JUDGMENT** shall be entered in favor of Defendant. Plaintiff's state-law claims are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**, this  12th  day of September, 2013.

/s/ W. Louis Sands
**THE HONORABLE W. LOUIS SANDS,**
**UNITED STATES DISTRICT COURT**